**Rhonda GOULD, Plaintiff–Appellee,**

**Richard Conkey, Sr.; Shawn Spencer; and Theodora Lowe, Intervenors–Appellees,**

v.

**Donna E. SHALALA, Secretary of Health and Human Services, Defendant–Appellant.**

**No. 92–4338.**

United States Court of Appeals, Sixth Circuit.

Argued March 8, 1994.

Decided July 27, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Oct. 13, 1994.*

---

\* Boggs, Circuit Judge, would grant rehearing for the reasons stated in his dissent.

Thomas W. Weeks, Ohio State Legal Services Ass'n, Columbus, OH, David B. Dawson, Legal Aid Soc. of Cleveland, Cleveland, OH, Anne Sessums Rubin (argued and briefed), Southeastern Ohio Legal Service, Athens, OH, for Rhonda Gould.

Susan E. Morgenstern, Legal Aid Soc., Cleveland, OH, for Richard Conkey, Sr., Shawn Spencer, and Theodora Lowe.

William Kanter (argued), U.S. Dept. of Justice, Civ. Div., Appellate Staff, Patricia A. Millett, Malcolm L. Stewart (briefed), Washington, DC, for Secretary of Health and Human Services.

Before: MERRITT, Chief Judge; and GUY and BOGGS, Circuit Judges.

RALPH B. GUY, J., Circuit Judge, delivered the opinion of the court, in which MERRITT, Chief Judge, joined. BOGGS, Circuit Judge (pp. 721–22), delivered a separate dissenting opinion.

GUY, RALPH B. JR., Circuit Judge.

Defendant, the Secretary of Health and Human Services ("Secretary"),[1] appeals the district court's decision granting plaintiffs' motion for summary judgment. 819 F.Supp. 685. Defendant challenges the court's interpretation of 42 U.S.C. § 1382(c)(4), which authorizes the Secretary to depart from the agency's standard practice of using a retrospective accounting method in computing Supplemental Security Income ("SSI") benefits. Defendant also argues the district court erred by ordering her to promulgate a regulation with retroactive application and by certifying a plaintiff class, despite the fact that some members of the class had not exhausted their administrative remedies. For the reasons that follow, we reverse and remand.

### I.

The named plaintiffs represent a class of SSI recipients, 42 U.S.C. § 1381 *et seq.*, who also at one time were recipients of funds from the Aid to Families with Dependent Children ("AFDC") program, 42 U.S.C. § 601 *et seq.* Plaintiffs have brought this action seeking to force the Secretary to promulgate what they believe to be a statutorily-compelled regulation that would implement an exception to the agency's standard method of calculating the level of benefits payable to individual recipients. An analysis of the relevant SSI statutory provisions as well as their history and underlying policies is necessary to bring plaintiffs' arguments into sharper focus.

Congress established the SSI program in 1972 to provide government aid to the aged, blind, and disabled. *Farley v. Sullivan*, 983 F.2d 405, 407 (2d Cir.1993). The level of a recipient's benefit is dependent upon that recipient's income from other sources. Until 1981, benefits were calculated based on projections of future income for the calendar year. Pursuant to the enactment of the Omnibus Budget Reconciliation Act of 1981 ("OBRA"), Pub.L. No. 97–35, 95 Stat. 357,

<hr />

1. Although Secretary Donna E. Shalala is the named defendant in this appeal, actions taken by her immediate predecessors are also relevant to plaintiffs' claims.

however, the agency switched to a retrospective monthly accounting ("RMA") system. The change made good fiscal sense. *See Farley,* 983 F.2d at 410 ("Congress was primarily concerned with overpayments ($185 million in one six-month period) and a simplified administration which would save costs ($30–$60 million per year)."). RMA would enable benefit levels to be determined with more accuracy, since the amounts paid out to recipients would be tied to actual income received in the past, not speculation as to future income.[2]

As the Seventh Circuit has explained, "[u]nder [RMA], the secretary must compute a beneficiary's income based upon the recipient's income in a prior month. Pursuant to this legislation, the Secretary elected to determine benefit amounts based upon beneficiaries' income two months before the months in which the benefits were to be received." *Gay v. Sullivan,* 966 F.2d 1124, 1125 (7th Cir.1992) (citation omitted); *see also* 20 C.F.R. § 416.420(a) ("We use the amount of your countable income in the second month prior to the current month to determine how much your benefit amount will be for the current month.").

Although OBRA thus established RMA as the standard method for determining SSI benefit levels, RMA is by no means the only method available. As part of the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Pub.L. No. 97–248, 96 Stat. 324, Congress enacted what is now commonly referred to as the "reliable information exception." This exception is set forth in 42 U.S.C. § 1382(c)(4), which provides:

> (4)(A) Notwithstanding paragraph (3), if the Secretary determines that reliable information is currently available with respect to the income and other circumstances of an individual for a month (including information with respect to a class of which such individual is a member and information with respect to scheduled cost-of-living adjustments under other benefit programs), the benefit amount of such individual under this subchapter for such month may be determined on the basis of such information.
>
> (B) The Secretary shall prescribe by regulation the circumstances in which information with respect to an event may be taken into account pursuant to subparagraph (A) in determining benefit amounts under this subchapter.

The reliable information exception has received periodic treatment by the Secretary in the years since TEFRA's enactment. For instance, in November 1985, the Secretary issued a final regulation implementing OBRA. 50 Fed.Reg. 48,563 (1985). In the preamble to this regulation, the Secretary stated:

> Section 183 [of TEFRA] ... provide[s] that if the Secretary determines that reliable information is currently available to her with respect to income or other circumstances, she may determine the current month's benefit amount based on such information. It also provides that the Secretary must state in regulations the circumstances in which such information may be used to determine the SSI benefit amount. These regulations do not include a rule to determine a current month's benefit based on reliable information which is currently available. The Secretary has this matter under consideration, and is not exercising this authority at this time.

*Id.* at 48,565. The Secretary added:

> [T]he Act, as amended, also provides that the Secretary prescribe by regulation the circumstances under which there is reliable information currently available on other kinds of income so that changes in amounts may be used to determine the monthly SSI benefit for the month in

---

**2.** Title 42 U.S.C. § 1382(c)(1) states:

An individual's eligibility for a benefit under this subchapter for a month shall be determined on the basis of the individual's (and eligible spouse's, if any) income, resources, and other relevant characteristics in such month, and, except as provided in paragraphs (2), (3), (4), and (5) the amount of such benefit shall be determined for such month on the basis of income and other characteristics in the first or, if the Secretary so determines, second month preceding such month. Eligibility for and the amount of such benefits shall be redetermined at such time or times as may be provided by the Secretary.

which the change occurs. However, we have not yet determined the best way to implement this provision with reference to benefits other than Social Security increases at the time of an SSI benefit increase.

*Id.* at 48,568.

The Secretary addressed the reliable information exception again in April 1991 by issuing a "Notice That the Secretary of Health and Human Services is Declining to Determine Supplemental Security Income Benefit Amounts by Alternate Method." 56 Fed. Reg. 14,268 (1991). This notice was published after the agency had "examined information regarding other Federal benefit programs to determine whether these sources could provide reliable information which is currently available and is administratively feasible to use." *Id.* at 14,268. In this notice, the Secretary reiterated the belief that 42 U.S.C. § 1382(c)(4) does not require the promulgation of a reliable information exception:

[This provision] of the Act provides that if the Secretary determines that reliable information is currently available about an individual's income and other circumstances for a month, the Secretary, in his discretion, may determine the SSI benefit amount for that month on the basis of that information rather than based on income and other characteristics from the first or second prior month as required under RMA pursuant to section 1611(c)(1) of the Act. If the Secretary determines that reliable information is currently available which he will use to affect the current SSI benefit amount, [42 U.S.C. § 1382(c)(4)(B) ] requires the Secretary to issue regulations prescribing the circumstances in which the information may be

used to determine the SSI benefit amount. However, the Secretary, at his discretion, may continue to use retrospective monthly accounting even if he identifies reliable information which is currently available.

56 Fed.Reg. at 14,268. The Secretary concluded:

Based on the foregoing review and examination of computer interface information, the Secretary has determined that no reliable information which is currently available which is administratively feasible to use exists. Therefore, the Secretary is exercising his discretion by declining to determine the SSI benefit amount for a current month using an alternate method, as provided under [42 U.S.C. § 1382(c)(4) ].

*Id.* at 14,269.

Plaintiffs do not challenge RMA in the abstract; instead, they take issue with the effect the use of RMA had on individuals like themselves, individuals who had been receiving AFDC benefits until they became eligible for SSI. Specifically, plaintiffs claim that they are the victims of what has been called a "perverse inaccuracy" or a "glitch," *Gay,* 966 F.2d at 1125–26, in the system. As they point out, AFDC recipients are prohibited from simultaneously receiving funds from both AFDC and SSI; in other words, a determination of SSI eligibility negates AFDC eligibility by operation of law. 42 U.S.C. § 602(a)(24). At least in theory, then, if AFDC payments are counted towards an SSI recipient's "income" and the SSI payments are reduced accordingly, that recipient will be underpaid by the amount of his or her AFDC payment for the first two months of SSI eligibility.[3]

The theory, however, does not necessarily play out in practice, for AFDC payments to a

---

**3.** Congress did away with this glitch by enacting section 9106 of the Omnibus Budget Reconciliation Act of 1987, 42 U.S.C. § 1382(c)(5). This provision states in relevant part:

Notwithstanding paragraphs (1) and (2), any income which is paid to or on behalf of an individual in any month pursuant to (A) a State plan approved under part A of subchapter IV of this chapter (relating to aid to families with dependent children) ... shall be taken into account in determining the amount of the benefit under this subchapter of such individual

(and his eligible spouse, if any) only for that month, and *shall not be taken into account in determining the amount of the benefit for any other month.*

42 U.S.C. § 1382(c)(5) (emphasis added). We have held, however, that this provision does not apply retroactively. *Ryan v. Sullivan,* 972 F.2d 721, 722–23 (6th Cir.1992); *see also Gay,* 966 F.2d at 1126–27. It does not therefore address the claims of AFDC recipients who became eligible for SSI benefits between the time the agency first began using RMA and the time § 1382(c)(5) went into effect.

particular recipient are not always stopped immediately upon a determination that that recipient is also entitled to SSI benefits. Indeed, given the volume of information these programs must process (not to mention the fact that the programs are not integrated), it seems unrealistic to assume that the transition from one program to the other would occur as precisely envisioned in all instances. In short, the difficulty associated with administering assistance programs of such magnitude gives rise to its own "glitch," one that frequently results in overlapping payments under both programs for a period of at least one month.

It is nevertheless incontrovertible that individuals do exist who—at least from their perspectives—got short-changed out of the equivalent of one and possibly two months' worth of their AFDC entitlement. One such individual, plaintiff Rhonda Gould, initiated this action by filing a class action suit in federal court in August 1987. Specifically, Gould's complaint sought, *inter alia,* a declaration that the Secretary's practice of applying RMA for purposes of assessing SSI benefit levels for former AFDC recipients violates the Social Security Act; a writ of mandamus directing the Secretary to promulgate regulations implementing the reliable information exception; and an order requiring the Secretary to restore all underpayments resulting from the complained of practice. Subsequent to the filing of Gould's complaint, Richard Conkey, Shawn Spencer, and Theodora Lowe successfully moved to intervene.

Two rulings of the district court are of particular importance to this appeal. The first involves the court's decision regarding class certification. *Gould v. Sullivan,* 131 F.R.D. 108 (S.D. Ohio 1989) ("*Gould I* "). In *Gould I,* the court, over the Secretary's objections, agreed to certify a class

consisting of all Ohio residents who, between 1982 and 1988, received less than the full amount of SSI benefits to which they otherwise might have been entitled as a result of the Secretary's decision to in-

clude AFDC benefits as part of income to be taken into account in determining the amount of initial SSI payments.

*Id.* at 116. In the second case, *Gould v. Sullivan,* 819 F.Supp. 685 (S.D. Ohio 1992) ("*Gould II* "), the court granted plaintiffs' motion for summary judgment and ordered the Secretary to, within 90 days, "propose, in accordance with 5 U.S.C. § 553, a rule implementing the reliable information exception contained in 42 U.S.C. § 1382(c), and to consider in that process whether, without regard to concerns of retroactivity, the situations of the class plaintiffs should be encompassed within such a rule." *Id.* at 692.

After the court issued its *Gould II* decision, the Secretary moved this court for a temporary stay of judgment, arguing that the date for compliance set by the district court, December 31, 1992, was impracticable. We granted the requested relief on December 31, 1992.[4] The Secretary then asked the district court for a stay pending appeal or an extension of the compliance date. In an order entered on February 5, 1993, the district court denied the Secretary's request for a stay, but extended the compliance date to March 16, 1993. Rather than seeking to extend the stay even further, the Secretary published a Notice of Proposed Rulemaking. 58 Fed.Reg. 14,191 (1993). This notice essentially reasserted the Secretary's earlier claim that "no information exists which is reliable and currently available to use in computing SSI benefit amounts pursuant to [42 U.S.C. § 1382(c)(4) ]." *Id.* at 14,193. The Secretary also defined "reliable information" as "payment information maintained on a computer system of records by the government agency determining the payments," and "currently available information" as "information that is available to the Secretary within the time required for us to compute and issue a correct SSI benefit for the month the information is pertinent." *Id.* at 14,192. With regard to the instant case, the Secretary noted:

The district court in *Gould* directed the Agency in publishing a regulation concern-

---

4. Applications for stay are normally made in the district court. Fed. R.App. P. 8(a). In accordance with this rule, the Secretary filed a motion for a stay in the district court. We decided to

entertain the Secretary's motion because the judge who rendered the order at issue was away from his chambers at the time and would not be available until the week of January 4, 1993.

ing section 1611(c)(4) to consider whether the situations of Aid to Families with Dependent Children (AFDC) recipients prior to April 1, 1988, should be covered by such a rule. With respect to these individuals, we considered the availability of reliable information regarding the AFDC payments. We have never maintained computer interfaces with State agencies including those administering the AFDC benefit programs. Therefore, based on our proposed definition, reliable information regarding AFDC, has not been and is not currently available to us.

*Id.* at 14,192–93.

## II.

■ The primary question presented on appeal is whether 42 U.S.C. § 1382(c)(4) is permissive or mandatory in nature—that is, whether the provision requires the Secretary to promulgate a "reliable information" regulation, or alternatively, whether the Secretary retains discretion not to do so. In analyzing this question, we are mindful of the Supreme Court's decision in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In *Chevron*, the Court held that when an agency interprets a statute it is charged with administering, that interpretation (if reasonable) is entitled to deference from a reviewing court. *Id.* at 843, 104 S.Ct. at 2781–82. The *Chevron* rule of deference, however, applies only where Congress has not spoken directly to the precise question at issue. If congressional intent on the matter can be ascertained, a reviewing court's task is complete, for the court need only give effect to Congress's expressed wishes to dispose of the dispute.

■ Thus, only if Congress has not directly resolved the interpretive question— *i.e.*, if the statute is either silent or ambiguous—may the court go on to assess the interpretation urged by the agency. In this instance, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* (footnote omitted). Of course, a given statutory provision may yield more than one plausible interpretation. Under *Chevron*, then, the

fact that a reviewing court may not have adopted the agency's interpretation had it been the initial arbiter is immaterial; absent a finding that the agency's interpretation is untenable, a court does not possess the authority to substitute its own reading of a statute for the agency's. *See also American Academy of Ophthalmology, Inc. v. Sullivan,* 998 F.2d 377, 382–83 (6th Cir.1993).

■ Here, the district court found fault with the Secretary's reading of 42 U.S.C. § 1382(c)(4). Specifically, the court rejected the contention that § 1382(c)(4) confers discretion on the Secretary to decide whether or not to implement a reliable information exception to RMA. The court's decision was based primarily on the text of the provision, itself, although the court did find some of the "legislative history and other extraneous material … fairly persuasive" as well. *Gould II,* 819 F.Supp. at 691. The court explained:

The Secretary's contrary argument focuses to a large extent not on 42 U.S.C. § 1382(c)(4)(B), but on subsection (A). That subsection, to be sure, contains some language of discretion. It provides that the Secretary "may" determine the amount of monthly benefits prospectively rather than retrospectively if the Secretary has made a determination that "reliable information is currently available" concerning the amount of other income to be received during that month. The fact that the Secretary is authorized (one of the meanings of "may") to take such information into account is also reiterated in subsection (B). However, no such arguably discretionary language is contained in the first part of that subsection, which contains the duty to prescribe a regulation implementing the reliable information exception. The word Congress chose is "shall." "Shall" does not ordinarily mean "may," any more than the duty to prescribe a regulation is fulfilled by stating that no regulation will be prescribed.

*Id.*

■ Notwithstanding this careful textual analysis of § 1382(c)(4), we find that the district court erred in its assessment of the Secretary's interpretation. In particular, we

are not convinced that the meaning of § 1382(c)(4) is "plain." *Id.* at 690 ("If the statutory language is plain, it conclusively establishes the intent of the legislature except in those rare cases where the result of giving the statute its plain meaning is demonstrably different from the clear intent of the drafters of the statute.") (citing *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1030–31, 103 L.Ed.2d 290 (1989)). Indeed, if anything, the text of § 1382(c)(4), in our estimation, tends to support the Secretary's argument that the provision is merely permissive, and not mandatory, in nature. Although the district court has taken a contrary view of the relationship between subsections (A) and (B), we are persuaded that the phrase "shall prescribe by regulation" of subsection (B) describes *the method* by which a reliable information exception to RMA should be implemented, not *the fact* that such implementation must occur.[5] Under our reading of § 1382(c)(4), subsection (B) is triggered only by the satisfaction of two conditions set forth in subsection (A): first, the Secretary must determine that reliable information does exist; and second, the Secretary must approve of the use of such information as an alternative means of calculating SSI benefit levels.[6] Neither condition has been met in this case, and as such, subsection (B)'s mandatory language is, for our purposes, inapposite.[7]

We also note that, like the text, the legislative history accompanying § 1382(c)(4) does not definitively resolve the issue of whether the provision is mandatory or permissive. To the extent there is legislative history on point, however, it would seem to militate in the Secretary's favor. RMA was implemented to cut down on the inaccuracies that resulted from the use of a prospective accounting system. Not surprisingly, Congress was principally concerned with overpayments, although underpayments were also of some concern. As the Second Circuit has explained:

> Plaintiffs argue that "[t]he overriding goal of [RMA] is to enable the Secretary to make more accurate benefit computations." While true, this statement sidesteps the fact that Congress was concerned chiefly with adopting an accounting process that was simple and would reduce the number of overpayments. The simplified accounting process was designed to save both time and money. The Secretary's decision to use information for one month to calculate benefits for a three-month transitional period satisfies both those goals.

*Farley,* 983 F.2d at 410.

RMA diminishes, without completely eliminating, the slippage that plagued the former, prospective accounting method. Although, as in this case, the use of RMA may result in a shortfall, in other cases, RMA may actually occasion the opposite result. Just as the Secretary has decided against compensating recipients facing the former predicament, the Secretary also has declined to seek reimbursement from those individuals for whom RMA actually produces a windfall. To focus simply on the anomalies that RMA creates at the micro-level instead of the benefit it confers on the agency at the macro-level, however, is to overlook the principal reason the method was adopted in the first place—to simplify the accounting process, thereby increasing accuracy and decreasing waste. Thus, while in the aggregate, recipients come out roughly even, the government, under

---

**5.** By requiring implementation by regulation, the Act ensures that recipients receive clear notice of the methodology used in determining their benefit levels.

**6.** Thus, even if the Secretary were to deem certain information "reliable," the Secretary would still retain, consistent with the permissive language of subsection (A), the discretion not to implement an exception based on this information.

**7.** The fact that the Secretary has not promulgated any regulations on the subject does not affect

our obligation to defer to the Secretary's reasonable interpretation of § 1382(c)(4). *See State of Georgia, Dep't of Medical Assistance v. Shalala,* 8 F.3d 1565, 1571 n. 8 (11th Cir.1993) (For the *Chevron* doctrine to apply, a "rule would be preferable, but we are not convinced that the agency is required to promulgate rules pursuant to every subsection of the widely-acknowledged complex Medicaid statute."); *Emerson v. Steffen,* 959 F.2d 119, 122 (8th Cir.1992) ("*Chevron* [does not] require[] that the agency's position be stated in a regulation to be entitled to deference.").

RMA, should come out on top, at least vis-a-vis its pre–1981 practice.

Again, whether the Secretary's interpretation of § 1382(c)(4) is more "correct" than the interpretation adopted by the district court is beside the point. Instead, the salient question is whether the former falls within the range of reasonable interpretations. We conclude that it does.[8]

### III.

Because we have determined that the district court could not compel the Secretary to promulgate a regulation implementing the reliable information exception, we need not reach the two other issues raised by the Secretary; namely, whether the court could properly order that the Secretary's regulation have retroactive application, and whether the court erred in certifying a plaintiff class containing members who had neither exhausted their administrative remedies nor sought judicial review within 60 days of a final administrative decision, as required by 42 U.S.C. § 405(g).

**REVERSED** and **REMANDED** with instructions to dismiss.

BOGGS, Circuit Judge, dissenting.

The court's opinion in this case countenances the extremely anomalous result that when a person transfers from one welfare program (AFDC) to another (SSI), a transfer that is legitimate and that appears to have been made available for the benefit of the claimants, the claimant will automatically lose a significant amount of income for up to two months. This result both negates the purpose of Congress in creating the SSI program and contradicts the clear command of 42 U.S.C. § 1382(c)(4)(B).

The Secretary appears determined to short-change the plaintiffs in this case. The court is not correct in arguing that Congress has simply set out a rough-and-ready measure that benefits some claimants and injures others, while coming out about even overall. Maj. op. at 720–21. There is no evidence in the record to support this proposition. Instead, Congress mandated that, in *general*, parties should receive benefits based on a previous month's earnings. This was to prevent parties from "low-balling," or giving a pessimistic projection of future income, in order to get greater benefits. By resting the benefit computation on past earnings and income, Congress made it much more difficult for claimants to pad their benefits, whether through cheating or pessimism.

In our case, however, it is known by operation of law that the claimants will not receive in future months the AFDC benefits that the Secretary is determined to assume that they will receive. In the reverse scenario, the government is quite ready, willing, and able to reduce a coming month's benefits when by operation of law the parties are due to receive *more money*, as with a Social Security increase. *See* 20 C.F.R. § 416.420(a) (adopted Nov. 26, 1985). Here, in just the same fashion, the government knows that, by operation of law, the parties' benefits will be reduced in the coming month. Indeed, it is the government that is imposing the reductions. And yet the Secretary obstinately refuses to take these reliably known facts into account.

That refusal may be the Secretary's right under the discretion granted by statute. She does not, however, have the right to proceed without following the Congressional mandate to adopt a regulation and to publish the facts on the record, "let[ting the f]acts be submitted to a candid world." *The Declaration of Independence*, para. 2 (U.S. 1776). There is a world of difference between simply refusing to adopt a regulation, and affirmatively adopting a regulation that takes a potentially unpalatable position. There are important policy reasons that rulemaking procedures exist and are often required by statute. In the first place, when the Secretary ultimately places the imprimatur of the Department and the Administration on a course of action by

---

**8.** The district court's assertion that the Secretary has taken inconsistent positions regarding this issue is belied by the Secretary's past acts. In fact, the Secretary has, from the most recent pronouncement (1993 Notice of Proposed Rule-making) to those issued in 1991 (Notice) and 1985 (final regulation), maintained the belief that the decision to implement a reliable information exception rests within the Secretary's sound discretion.

adopting a regulation, she affords the public a transparent view of what is happening. Therefore, it is simply more difficult to adopt an unpopular or untenable position in so clear a way.

Second, under the APA, an interested party enjoys a clearer opportunity to challenge a course of action that has been affirmatively adopted in a regulation than he does if he desires to challenge a failure to take action. See *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). To my mind, this is why Congress used quite different words in subparagraphs (A) and (B) of 42 U.S.C. § 1382(c)(4). Subparagraph (A) says that the Secretary "may" adjust payments based on prospective months if she determines that reliable information is currently available. Thus, the Secretary has discretion, even when she finds that reliable information is available, to grant or deny an adjustment. I agree with the court to that extent.

However, subparagraph (B) states with equal clarity that the Secretary "*shall*," that is, she must, issue regulations that explain when and how she plans to find "reliable information." If she were to issue such a regulation, the Secretary would have to go on the public record and defend her inability to find as "reliable" information that is plain for all to see. In addition, under the formal rulemaking process, such a decision, that no "reliable information" is "currently available," could be directly challenged as being arbitrary and capricious. 5 U.S.C. § 706(2)(A). Third, the formal rulemaking process would place the parties on notice as to the standards by which the Secretary defines "reliable information." Parties who believe that they are being short-changed at least would have the opportunity to endeavor to produce information that is sufficiently "reliable" to convince the Secretary that it fits within the terms of the statute. For all these reasons, the action of Congress in making subparagraph (B) mandatory should not lightly be set aside.

I do not believe that the *Chevron* "reasonable interpretation" standard, *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), allows the Secretary to make a choice to interpret the word "shall" as permissive rather than mandatory. I know of no case that directly so holds, and we know that the "shall/may" distinction and confusion is one that arises quite frequently in our jurisprudence. See e.g., *United States v. Rodgers*, 461 U.S. 677, 706–08, 103 S.Ct. 2132, 2149–50, 76 L.Ed.2d 236 (1983); *Morgan Srvcs., Inc. v. Local 323, Chicago & Cent. States Joint Bd., Amalgamated Clothing & Textile Workers Union*, 724 F.2d 1217, 1223 n. 9 (6th Cir.1984).

This case does not fall within the *Chevron* pattern, in which an agency interprets a general or ambiguous word or phrase in a statute. In *Chevron* itself, the agency had to interpret whether a "source" of pollution meant a single smokestack or the collection of smokestacks that made up a particular building or industrial operation. See 467 U.S. at 854–58, 104 S.Ct. at 2787–89. Such an interpretative choice is greatly different from altering fundamental limitations on the grant of discretion itself, such as the shall/may distinction. Furthermore, in *Chevron* itself it was clear that the Secretary would have to make some type of discretionary definition to deal with the question of what is a "source." Here, the statute by its own terms does not appear to allow discretion as to whether or not the Secretary should promulgate a regulation; rather, it only allows discretion in what the Secretary is to do with information once it is assessed in accordance with that regulation.

I therefore respectfully dissent and would reverse and remand with instructions that the Secretary carry out her statutory mandate to issue a regulation and place the matter in the open, on the record, and subject to challenge.