Juanita NEWMAN, on behalf of herself and all others similarly situated, Plaintiff–Appellant,

v.

Kenneth APFEL, Commissioner of the Social Security Administration, Defendant–Appellee.

No. 98–56397.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 5, 2000

Filed Aug. 2, 2000

Gerald A. McIntyre (argued) and Herbert Semmel, National Senior Citizens Law Center, Los Angeles California, for the plaintiff-appellant.

Frank W. Hunger, Assistant Attorney General, Nora Manella, U.S. Attorney, William Kanter, and Frank A. Rosenfeld (argued), Washington, D.C., for the appellee.

Before: REINHARDT and O'SCANNLAIN, Circuit Judges, and SCHWARZER,* Senior District Judge.

Opinion by Judge O'SCANNLAIN; Dissent by Judge REINHARDT.

O'SCANNLAIN, Circuit Judge:

We must decide what discretion the Commissioner of Social Security possesses to make adjustments in Supplemental Security Income benefits based on changes in a recipient's monthly income.

I

The Supplemental Security Income ("SSI") program, provided for at 42 U.S.C. § 1381 et seq., provides cash payments to aged, blind, and disabled Americans for the purpose of ensuring that they have "at least a subsistence level income." *Paxton v. Secretary of HHS*, 856 F.2d 1352, 1353 (9th Cir.1988) (citing 20 C.F.R. § 416.110). The benefits are meant to "supplement an individual's other sources of income." *Id.*

* The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

The named plaintiff in this class action, Juanita Newman ("Newman"), challenges a regulation promulgated by the Commissioner of Social Security ("Commissioner") declaring that there will be no discretionary exception to the standard method of retrospective monthly accounting ("RMA") used to determine SSI benefits. Under the current RMA regime, the Commissioner does not alter the amount of an SSI recipient's benefits in response to a change in the recipient's income until two months after that change has occurred. Congress, however, has enacted a statute directing the Commissioner to promulgate a regulation indicating "reliable" and "currently available" information on which SSI benefits could be adjusted without this two-month delay and has authorized the Commissioner to make current-month adjustments based on this information. Newman, who was adversely affected by the Commissioner's decision against implementing current-month accounting under any circumstances not expressly required by statute, sued on behalf of herself and others who are similarly situated both for invalidation of the Commissioner's regulation and recalculation of past benefits under a retroactively applied rule recognizing an exception for income changes like her own.

## A

As originally enacted, the SSI program directed calculation of benefits based on the recipient's projected income in a given quarter. This prospective accounting method resulted, however, in substantial overpayment of benefits. In 1981, Congress amended the program so that benefit levels for a given month would be determined on the basis of the recipient's monthly income either one or two months before (at the Commissioner's discretion). *See* 42 U.S.C. § 1382(c)(1). This is the RMA method. The Commissioner has since consistently relied on income figures from the second month before the current month in calculating benefits. *See* 20 C.F.R. § 416.420(a).

In 1982, Congress enacted an exception to remedy the fact that the RMA method still resulted in consistent overpayments by delaying the Commissioner's response to cost-of-living adjustments ("COLAs") in recipients' non-SSI government benefits. (Two months would pass under RMA before the Commissioner reduced recipients' SSI benefits in order to account for the widespread and predictable increases in non-SSI income resulting from COLAs.) The 1982 amendment stated:

(A) *[I]f the Commissioner of Social Security determines that reliable information is currently available* with respect to the income and other circumstances of an individual for a month (including information with respect to a class of which such individual is a member and information with respect to scheduled cost-of-living adjustments under other benefit programs), the benefit amount of such individual· under this subchapter *may be determined on the basis of such information.*

(B) The Commissioner of Social Security shall prescribe by regulation the circumstances in which information with respect to an event may be taken into account pursuant to subparagraph (A) in determining benefit amounts under this subchapter.

42 U.S.C. § 1382(c). This exception to the one- or two-month delay caused by the RMA method is known as the "reliable information exception."[1] Notwithstanding this enactment, the Secretary of Health and Human Services (the Commissioner's

---

1. Congress has elsewhere expressly mandated that some changes in a recipient's non-SSI income be considered in calculating the recipient's SSI benefits for the current month. *See* 42 U.S.C. § 1382(c)(5) (mandating current-month accounting for foster care assistance, assistance for refugees and Cuban and Haitian entrants, and assistance provided by the Bureau of Indian Affairs).

predecessor)[2] never promulgated a regulation indicating the "circumstances in which information with respect to an event may be taken into account" for the purpose of calculating recipients' SSI benefits for the current month.

From 1983 until 1987, Newman, a disabled mother and widow, received benefits under both the SSI program and the Social Security Title II program (which is also administered by the Commissioner). In 1987, Newman's daughter reached the age of 16, and Newman thus lost her eligibility for Title II benefits. The Commissioner apprised Newman of the impending loss of her Title II benefits five months before their discontinuation but, in keeping with the RMA method, did not increase Newman's SSI benefits in order to offset the loss of income under Title II until two months after that loss occurred. Newman thus went two months of 1987 without meeting the "minimum income level" set by SSI regulations.

Newman filed a class action in federal district court, seeking declaratory and injunctive relief from the Secretary's (and, subsequently, the Commissioner's) failure to promulgate a regulation pursuant to 42 U.S.C. § 1382(c)(4) describing "reliable" and "currently available" information and allowing for current-month calculations of SSI benefits using such information. A similar action was filed in Ohio, and the United States Court of Appeals for the Sixth Circuit ultimately decided that there was no duty to promulgate a regulation describing or allowing the current-month use of "reliable" and "presently available" information unless it was determined that such information existed. *See Gould v. Shalala,* 30 F.3d 714 (6th Cir.1994). We reached the contrary conclusion in Newman's case, holding that 42 U.S.C. § 1382(c)(4)(B) required the Commissioner to promulgate a regulation describing what kind of information would amount to "reli-

able" and "currently available" information and how that information would be used. *See Newman v. Chater (Newman I ),* 87 F.3d 358 (1996). We explicitly declined to address the issue of whether such a regulation would apply retroactively (and thus to Newman's benefit), indicating that the issue "should be addressed only after the regulation is final." 87 F.3d at 362.

In response to our decision in *Newman I,* the Commissioner promulgated a regulation in June 1997 defining the terms "reliable" and "currently available" and determining that, because no such information existed, there would be no exception to the standard RMA method under 42 U.S.C. § 1382(c)(4). That regulation reads:

> (c) *Reliable information which is currently available for determining benefits. The Commissioner has determined that no reliable information exists which is currently available to use in determining benefit amounts.*
>
> (1) *Reliable information. For purposes of this section, "reliable information" means payment information that is maintained on a computer system of records by the government agency determining the payments (e.g., Department of Veterans Affairs, Office of Personnel Management for Federal civil service information and the Railroad Retirement Board).*
>
> (2) *Currently Available Information. For purposes of this section, "currently available information" means information that is available at such time that it permits us to compute and issue a correct benefit for the month the information is pertinent.*

20 C.F.R. § 416.420.

### B

Newman filed this class action in the Central District of California in September 1997, challenging the Commissioner's reg-

---

**2.** *See* Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103–296 (transferring power to administer

Social Security program from the Secretary of HHS to the Commissioner).

ulation as "contrary to law" and seeking review of the Commissioner's refusal to reimburse her. The Commissioner moved for dismissal, arguing that Newman lacked standing and that the regulation was a matter committed to agency discretion that the district court therefore lacked jurisdiction to review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq. The Commissioner moved for summary judgment, and Newman moved for certification of the plaintiff class.

The district court denied the Commissioner's motion to dismiss but granted the Commissioner's motion for summary judgment and thus denied Newman's motion for class certification as moot.[3] The court rejected the Commissioner's claim that its subject matter jurisdiction was defeated because the regulation was a matter committed to the Commissioner's discretion by law. The court also held that Newman had standing to sue and, in doing so, rejected the Commissioner's argument that Newman's injury was nonredressable because the Commissioner was precluded under *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), from promulgating a regulation that would apply retroactively to Newman's case. In granting summary judgment for the Commissioner, the court concluded that the regulation at issue was a reasonable interpretation of the ambiguous statutory terms "reliable" and "currently available" and that the terms of the statutory provision were permissive rather than mandatory. The court held that the Commissioner's interpretations were thus entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

Newman filed a timely notice of appeal.

## II

We must first consider whether Newman has standing to sue, for standing is a "threshold jurisdictional question." *Steel Company v. Citizens for a Better Env't*, 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). "The 'irreducible constitutional minimum of standing' contains three requirements." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). First, Newman must show that she suffered an "injury in fact." *Id.* at 103, 118 S.Ct. 1003. Second, she must show "a fairly traceable connection between [her] injury and the complained-of conduct of the [Commissioner]." *Id.* Third, Newman must show that her injury is redressable. *See id.* That is, she must show that there is a likelihood that the relief she requests will redress her alleged injury. *See id.*

The Commissioner argued before the district court and contends again here that Newman lacks standing to sue because she cannot meet the third standing requirement, that of redressability. The Commissioner contends that the only remedy that we could provide in this case would be an injunction compelling the Commissioner both to promulgate a rule declaring data about an SSI recipient's Title II benefits "reliable" and "currently available" information and to recalculate Newman's 1987 benefits under the new rule. Given this limitation, the Commissioner insists, there is no remedy that would redress Newman's claimed injury, because the Commissioner simply lacks the power to promulgate a new regulation that would apply retroactively to benefits paid to Newman over ten years ago.

The Commissioner cites the Supreme Court's decision in *Georgetown University Hospital* for the proposition that he lacks the power to promulgate new regulations with retroactive application. In that case, the Secretary of Health and Human Services issued a Medicare cost-limit schedule that altered the way the underlying hospi-

---

3. The court also rejected mandamus jurisdiction after finding that Newman could "not establish that the Commissioner owed her a 'clear nondiscretionary duty.'"

tal "wage index" was calculated by excluding federally run hospitals from consideration. *See* 488 U.S. at 206, 109 S.Ct. 468. The new cost-limit schedule was invalidated as having been promulgated in violation of the APA, because the Secretary had neither given notice nor solicited public comment on the potential rule-change. *See id.* The Secretary proceeded to promulgate the rule anew, with retroactive application, by following the procedures required by the APA. *See id.* at 207, 109 S.Ct. 468. The Supreme Court struck down this effort:

> It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress. In determining the validity of the Secretary's retroactive cost-limit rule, the threshold question is whether the Medicare Act authorizes retroactive rulemaking.
>
> .... [A] statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms. Even where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant.

*Id.* at 208–09, 109 S.Ct. 468 (citations omitted). Underscoring the breadth of the rule that agencies will not be presumed to have the power to enforce rules retroactively, the Court flatly rejected the Secretary's argument that the anti-retroactivity principle should not apply in "unique occurrence[s]," such as when the original rule was judicially invalidated and the retroactive application of the new rule extends only to the effective date of its invalidated predecessor. *See id.* at 215, 109 S.Ct. 468. The Court stated simply:

> Whatever weight the Secretary's contentions [that congressional intent and important administrative goals would otherwise be frustrated] might have in

other contexts, they need not be addressed here. The case before us is resolved by the particular statutory scheme in question. Our interpretation of the Medicare Act compels the conclusion that the Secretary has no authority to promulgate retroactive cost-limit rules.

*Id.* Although the Court in *Bowen* thus indicated only how retroactive rulemaking would "generally" be received, the logic of the Court's decision clearly rests on an absolute bar against an agency's retroactive rulemaking absent statutory authority.

We agree with the district court that the Commissioner's discharging a judicial order to make Newman whole would not require the Commissioner to promulgate retroactive regulations in the way that the Court contemplated in *Bowen*. *Bowen* spoke only in terms of an agency's inability to apply rules retroactively *sua sponte*. The capacity of the courts to order retroactive relief has never been questioned. Indeed we have often relied on this authority in cases analogous to this one. *See, e.g., Livermore v. Heckler,* 743 F.2d 1396 (9th Cir.1984). In *Livermore*, we ordered "recalculation of benefits erroneously calculated as well as prospective implementation of the correct [rule]." *Id.* at 1405. We thus think it plain that Newman's claim is redressable, for the relief that she appropriately seeks would "remedy the injury suffered." *Steel Co.,* 523 U.S. at 107, 118 S.Ct. 1003. Newman, therefore, has standing to sue.

### III

■ The Commissioner also argues that we lack jurisdiction to review the relevant regulation because "the matter is committed to agency discretion by law." The Commissioner thus contends that his regulation is unreviewable under an exception to the APA's judicial review provisions:

> "This chapter [relating to judicial review] applies, according to the provisions thereof, except to the extent that (1)

statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."

5 U.S.C. § 701(a). The Supreme Court has interpreted the exception on which the Commissioner relies, § 701(a)(2), to preclude judicial review of an agency's allocation of a lump-sum appropriation, *see Lincoln v. Vigil,* 508 U.S. 182, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993), an agency's decision not to institute enforcement proceedings, *see Heckler v. Chaney,* 470 U.S. 821, 831, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), an agency's refusal to grant reconsideration of an action because of material error, *see ICC v. Locomotive Eng'rs,* 482 U.S. 270, 280, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987), and the CIA's termination of an employee in the interests of national security, *see Webster v. Doe,* 486 U.S. 592, 599–601, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988). In doing so, the Court has noted that the APA nevertheless embodies a "basic presumption of judicial review." *Vigil,* 508 U.S. at 190, 113 S.Ct. 2024. The Court has also emphasized that § 701(a)(2) stakes out "a very narrow exception." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

The Court has adverted to two circumstances in which judicial review is foreclosed under § 701(a)(2). The first of these circumstances is that in which "a court would have no meaningful standard against which to judge the agency's exercise of discretion" and there thus " 'is no law to apply.' " *Chaney,* 470 U.S. at 830, 105 S.Ct. 1649 (quoting *Volpe,* 401 U.S. at 410, 91 S.Ct. 814). The second such circumstance is that in which the agency's action requires "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including the prioritization of agency resources, likelihood of success in fulfilling the agency's statutory mandate, and compatibility with "the agency's overall policies." *Id.* at 831, 105 S.Ct. 1649; *Vigil,* 508 U.S. at 193, 113 S.Ct. 2024.

In this case, Newman argues that the Commissioner interprets and applies the statutory terms "reliable" and "currently available" in a way that is arbitrary and capricious. Such a claim does not defy meaningful review, and (though the Commissioner argues to the contrary) we do not believe that the basic definition and application of those terms involves a complicated balancing of a number of factors that are so peculiarly within the agency's expertise that jurisdiction is necessarily defeated. *Cf. Volpe,* 401 U.S. at 411, 91 S.Ct. 814 (holding that § 701(a)(2) does not preclude judicial review of agency determination that a "feasible and prudent alternative" was lacking); *Keating v. FAA,* 610 F.2d 611, 612 (9th Cir.1979) (holding that an agency's charge to grant exemptions "in the public interest" provided a standard that was sufficiently meaningful for judicial review).

■ The Commissioner argues in the alternative that such observations are irrelevant, given that, "even if [he] determines that such information does exist, he can choose not to use it." We disagree. The fact that an agency has broad discretion in choosing whether to act does not establish that the agency may justify its choice on specious grounds. To concede otherwise would be to disregard entirely the value of political accountability, which itself is the very premise of administrative discretion in all its forms. Hence, the possibility that we might lack jurisdiction to review a regulation stating that there will be no exception to the RMA method notwithstanding the existence of information that is both "reliable" and "currently available" is irrelevant to the issue of whether we have jurisdiction to review the Commissioner's determination that no such information "exists." 20 C.F.R. § 416.420(c).

We conclude, therefore, that we have jurisdiction over Newman's claim despite the proviso at 5 U.S.C. § 701(a)(2).

## IV

As to the merits of her claim, Newman argues that the Commissioner's failure to establish an exception to the standard RMA method is invalid because it untenably operationalizes the terms "reliable" and "currently available" and therefore violates the "basic purpose of the SSI program," which is to guarantee recipients "at least a subsistence level income."

## A

▉ Newman's first substantive objection to the regulation relates to the way that the Commissioner applies the definition of "currently available information." In the regulation, the Commissioner defines such information as "information that is available at such time that it permits us to compute and issue a correct benefit for the month the information is pertinent." 20 C.F.R. § 416.420(c)(2). Newman does not challenge this definition *per se* but rather the Commissioner's categorical application of it. Newman argues that "it is apparent that Title II income information is reliable and that it is 'currently available' under the Commissioner's definition in most cases."

The Commissioner takes the position, however, that all information of a type must meet his definition or none of it does. *See, e.g.,* Reliable Information Which Is Currently Available, 62 Fed.Reg. 30,747, 30,749 (1997) (noting that information will not be used to the extent it will be available for calculating the benefits of only some of the recipients to whom the information relates within a certain month). He has thus indicated that Title II income information (the use of which would have ameliorated Newman's injury in 1987) is not "currently available" because the information for only half of the relevant recipients is generated early enough (by the tenth day of the month) to allow him to use it for the reduction of corresponding SSI benefits. *See id.* The Commissioner has asserted in the course of this litigation that he has relied on a categorical approach in

order to avoid "serious equitable problems." To his credit, the Commissioner has been forthcoming about the nature of those problems. *See id.* ("It would be inequitable to treat title II income differently in the computation of an SSI payment based on when in the month the income was received because such differing treatment could lead to different SSI benefit amounts for two individuals with identical title II income in a particular month.").

Newman argues that the Commissioner's equitable justification for his categorical approach is arbitrary. She contends that the Commissioner, pursuant to another statutory provision, adjusts a recipient's SSI benefits downward upon individual information of increased income, even though such information is not categorically available in time for such an adjustment of all recipients' benefit levels. Newman also contends that the Commissioner's categorical approach violates congressional intent. In support of her understanding of Congress's intent, she cites *Jones v. Shalala,* 5 F.3d 447, 451 (9th Cir.1993), and *Paxton v. Secretary,* 856 F.2d 1352, 1353 (9th Cir.1988), for the proposition that the purpose of the SSI program is "to 'ensure that claimants are able to maintain a minimum subsistence level.'" She also quotes the congressional conference committee report addressing the enactment of 42 U.S.C. § 1382(c)(4), H.R. Conf. Rep. No. 760, 97th Cong., 455 (1982), which indicates that "whenever the Secretary determines that there is reliable information concerning a recipient's income in a given month, the SSI benefit would be based on that information." Newman further contends that the Commissioner simply may not resort to equitable considerations in justifying his regulation.

The Commissioner argues in response that his decision to apply categorically the "currently available" requirement cannot violate Congress's intent because Congress itself mandated that the RMA method is to

be the standard method and has merely enacted a permissive provision that would allow the Commissioner to create an exception to RMA at his discretion.

## B

Newman also objects to the Commissioner's definition of "reliable" information as "payment information that is maintained on a computer system of records by the government agency determining the payments." 20 C.F.R. § 416.420(c)(1). Newman contends that the Commissioner's definition is arbitrary because it excludes other types of information that the Commissioner regularly relies upon in calculating benefits generally.

The Commissioner has suggested, however, that those other types of information are not "reliable" for purposes of current-month accounting because they require "additional verification":

> Because the data would be applied immediately to the computation of benefit amounts without additional verification, necessary components of "reliability" are that the data be obtained from the original source agency and that it be obtained in such a way that the Commissioner can be confident that no alteration has taken place.

62 Fed.Reg. 30747, 30750.

Newman rejects this distinction, however, because it is inapplicable to the calculation of past-due benefits, i.e., those benefits that should have been paid on the basis of events occurring more than two months before. In that process, Newman argues, the Commissioner does not need any more time for "additional verification" because the Commissioner has had more than the standard two months to confirm the reliability of all the information that he would use. The Commissioner's regulation is arbitrary, Newman thus concludes, because it would cause the Commissioner in this process to imply that a datum is reliable for purposes of calculating later past-due benefits and *simultaneously* to treat the datum as unreliable for purposes of calculating earlier past-due benefits.

The Commissioner has suggested that the resolution of this specific objection would introduce inefficiency and inequity into the benefits-calculation process. He noted in publishing the final regulation that using information for the calculation of past-due benefits that differs from the information used for the calculation of current benefits would require maintaining "two different sets of computation rules" and that these different rules would have the "inequitable" consequence that "two individuals with identical income in the same months [could] be due different benefit amounts, depending on when their payments were calculated." 62 Fed.Reg. at 30750.

## C

In sum, Newman does not attack the Commissioner's definitions of the terms "currently available" and "reliable" so much as his application of those definitions in discrete classes of cases. Newman objects to, first, the Commissioner's refusal to deem "currently available" that information that fits the bill only in the cases of recipients whose changes in circumstances occur sufficiently early in the month, and, second, the Commissioner's refusal to calculate the benefits of those recipients whose payments are past-due more generously than the benefits of those recipients whose benefits are paid currently. The Commissioner, for his part, defends his decisions by recourse to his equitable policy of treating similarly situated individuals similarly.

Having narrowed the legal issue, we think it easily resolved.

## V

The Supreme Court unequivocally established in *Chevron* that "legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute" so long as

"there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." 467 U.S. at 843–44, 104 S.Ct. 2778. Thus, "if the statute is silent or ambiguous with respect to the issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778.

There is no dispute that Congress has delegated to the Commissioner the authority to "elucidate" the language Congress enacted at 42 U.S.C. § 1382(c). The only issue we must decide, therefore, is whether the Commissioner's regulation is permissible. That is, we must decide whether the statute clearly expresses Congress's overriding intent that every individual's SSI grant be calculated on the basis of his current month income whenever reliable information with respect to that income is currently available (regardless of those equitable concerns that the Commissioner has raised in the pages of the Federal Register).

We conclude that it does not. The statute indicates only that the Commissioner "may" calculate the benefit amount of an individual on the basis of reliable, currently available information. 42 U.S.C. § 1382(c)(4); *see Gould v. Shalala,* 30 F.3d 714, 720 n. 6 (6th Cir.1994) ("[E]ven if the Secretary were to deem certain information 'reliable,' the Secretary would still retain, consistent with the permissive language of subsection (A), the discretion not to implement an exception based on this information."). As the district court noted, Congress's use of the term "may" in § 1382(c)(4)(A) contrasts starkly with the use of the term "shall" in the contiguous paragraph. *See* 42 U.S.C. § 1382(c)(4)(B) ("The Commissioner of Social Security

*shall* prescribe by regulation....") (emphasis added); *cf. Newman I,* 87 F.3d at 361 (distinguishing the "permissive language in paragraph (A)" from paragraph (B)).

Despite the permissive language in the text of the statute,[4] Newman argues that the overarching purpose of the SSI program and the legislative history of this provision jointly compel the conclusion that Congress has not given the Commissioner discretion to formulate an exception to the RMA method of calculating SSI benefits. As to the purpose of the SSI program, Newman suggests that, because the SSI program is intended to ensure a minimum subsistence level, the Commissioner cannot concern himself with anything but ensuring that every SSI recipient maintains a minimum subsistence level in any given month. This argument, however, cannot bear its own weight. It would require invalidation of the Commissioner's decision to use a two-month delay in his retrospective accounting rather than a one-month delay—even though 42 U.S.C. § 1382(c)(1) plainly vests in the Commissioner the discretion to elect either a one- or two-month delay.

Newman's remaining argument is that the legislative history compels an exception to the RMA method whenever the Commissioner has the necessary information. The only evidence that Newman adduces for this proposition is a statement from a conference committee report relating to § 1382(c)(4) that indicates that, "whenever the Secretary determines that there is reliable information concerning a recipient's income in a given month, the SSI benefit would be based on that information." H.R. Conf. Rep. No. 760, 97th Cong., 455 (1982). The force of Newman's

---

**4.** We recognize that the Supreme Court observed in *United States v. Rodgers,* 461 U.S. 677, 706, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983), that the "common-sense principle of statutory construction" that "may" implies discretion "can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute." In the context of this case, however, the Court's statement in *Rodgers* does not change the issue from what it is under *Chevron,* which is whether the purpose and legislative history of the statutory provision plainly establishes that the Commissioner's interpretation is untenable.

argument for invalidating the Commissioner's regulation thus comes down to the contention that we should credit a committee report interpreting the statute, which indicates that the Commissioner *must* use all information that is reliable and currently available, over the text of the statute itself, which indicates only that the Commissioner *may* use such information. Ceteris paribus, we must give the text of the statute the greater weight. In any event, we do not agree that the legislative history actually evinces a single-minded determination to force current-month accounting whenever possible. At least one other circuit has observed that Congress's intent was only to protect the public fisc. *See Gould*, 30 F.3d at 720 (noting that "Congress was principally concerned with overpayments").

## VI

We are satisfied that the Commissioner's regulation embodies a permissible interpretation of 42 U.S.C. § 1382(c). The district court's grant of summary judgment for the Commissioner is thus AFFIRMED.

REINHARDT, Circuit Judge, dissenting:

This case illustrates bureaucratic reasoning at its worst. It helps explain why so many Americans have so little confidence in government officials. In the name of equity, the Social Security Commissioner is administering the law in an arbitrary manner that benefits no-one and unnecessarily causes significant harm to a substantial number of aged, blind, and disabled individuals.

The Social Security Commissioner decided not to send full subsistence benefit payments to aged, blind, and disabled persons who were entitled to receive them, because he determined that to do so would be "inequitable." The "inequity," in the Commissioner's mind, was that the payment of full subsistence benefits to those whose claims were ready to be processed would be unfair to those whose claims were not yet ready and therefore could not receive their full payments simultaneously. On account of this purported inequity, the Commissioner omitted from the benefit checks of numerous aged, blind, and disabled persons payments to which they were indisputably entitled. The Commissioner not only made this odd determination in the name of "equity," but made it the basis for a regulation which enshrines his peculiar rationale in the governmental process. Because the Commissioner's regulation is so clearly arbitrary and capricious, it is not necessary to reach some of the other fundamental questions regarding the manner in which he administers these payments.

By the Commissioner's own admission, but for the policy he adopted, full benefit payments could have been mailed at an earlier time to a substantial number of aged, blind, and disabled persons who depend on them to meet their basic needs of food and shelter. Instead, in the name of "equity" the Commissioner needlessly and senselessly compelled Ms. Newman and countless other already impoverished SSI recipients to endure even greater hardship by living well below the subsistence level for a specified period of time.

What makes this case so disturbing is that for nearly fifteen years the Commissioner has succeeded in frustrating the goal of the program he is charged with administering: to provide aged, blind, and disabled individuals with a subsistence level income whenever possible. To hold, as the majority does today, that the Commissioner's policy is a reasonable exercise of his discretion is to exalt a robotic governmental desire for uniformity of payment dates over the far more important objective of insuring that a beneficent statute is applied in a manner that serves its essential humanitarian purpose—to provide individuals in need with the means of economic survival.

Juanita Newman is a disabled mother whose survival depended on receiving timely benefit payments. As calculated by the Social Security Administration, she was entitled to receive $580 per month to maintain a minimum subsistence income in order to feed, clothe, and house herself and her daughter. In 1987, Ms. Newman's minimum subsistence payment was comprised of two checks, one from the Social Security disability program, and one from the Social Security Title II program. The Title II payments constituted "mother's benefits" payable to her on account of her deceased husband's Title II earnings, because she had a child under age sixteen. In 1987, these Title II mother's benefits were $284 per month. Because the modest Title II benefits placed her well below the Federal minimum disability income level, she received an additional $296 per month in SSI benefits, in order to bring her to the $580 total that was necessary for her survival.

During March, 1987, Ms. Newman was notified by the Social Security Administration that, five months later, commencing in August of that year, she would no longer receive mother's benefits under Title II. The termination of her mother's benefits was predictable and automatic because her daughter would reach age sixteen on her upcoming birthday. Accordingly, as of August, Ms. Newman became entitled to a commensurate increase in her SSI benefits that would serve to maintain her monthly income at the subsistence level figure. Because of the accounting method employed by the Commissioner, however, the change in her Title II income was not reflected in her SSI grant until October, two months after her entitlement date. During August and September 1987, Ms. Newman had no income other than $296 in monthly SSI benefits and a one-time emergency SSI payment of $100, and she and her daughter were left without sufficient funds to make payments for housing and other essential needs.

The problem is not a new one. In 1982 Congress sought to remedy the Commissioner's built-in two-month delay in adjustments to SSI benefits by enacting the "reliable information exception" to the accounting method being used by the Social Security Administration. This provision encouraged the Commissioner to alter an individual's benefits for any month in which he "determines that reliable information is currently available with respect to the income and other circumstances of an individual." 42 U.S.C. § 1382(c). The amendment also stated that the Commissioner "shall prescribe by regulation the circumstances in which" a person's current income may be used to determine the payment of benefits under the reliable information exception. 42 U.S.C. § 1382(c).

For almost fifteen years, the Commissioner ignored this congressional policy and refused to promulgate a regulation. Finally, a suit was brought by Ms. Newman, and a similar action was filed in Ohio, to compel the Commissioner to implement the congressional provision. In those proceedings, the Commissioner vigorously defended his conduct. Only after this court ordered him to promulgate a regulation did he finally take any action. *See Newman v. Chater ("Newman I")*, 87 F.3d 358 (9th Cir.1996). The Commissioner then issued a regulation that eviscerated Congress's remedial amendment. The regulation adopted by the Commissioner, a decade and a half after the statutory amendment, states that "[t]he Commissioner has determined that no reliable information exists which is currently available to use in determining benefit amounts." 20 C.F.R. § 416.420. As a result, the congressional provision authorizing elimination of the two-month delay in changes to benefit payments where reliable information exists has never been implemented in any respect. Instead, the purpose of the SSI program, namely to ensure a minimum subsistence level for aged, blind, and disabled individuals, continues to be frustrated by the Commissioner's use of an inflexible and at times

senseless accounting system. In my opinion, the "non-regulation" the Commissioner ultimately adopted is arbitrary and capricious, and therefore unlawful.

I should note that there is an even more basic problem than the Commissioner's perverse theory of "inequity" that affects the validity of his regulation. Changes in Title II benefits that will result in commensurate changes in the amount of money to which a claimant is entitled through the SSI program are known to the agency many months in advance. As noted earlier, the SSA notified Ms. Newman in March that her Title II benefits would be terminated five months later, in August. Nevertheless, under the Commissioner's regulation, information regarding a certain change in Title II benefits is not considered "reliable" for purposes of determining a claimant's SSI entitlement until the Social Security Administration's computer registers the Title II payment change for the month in which the decrease actually occurs. The fact is, however, that under any reasonable construction, the reliable information *is* available many months before the Commissioner is willing to acknowledge that it is. Thus, there is no valid justification for the two month delay with respect to any of the recipients whose overall benefits must be adjusted because of the termination of Title II benefits. However, it is not necessary to decide that question finally here because, as explained above, the theory of "inequity" which underlies the regulation and its finding of "no reliable information" is patently erroneous and renders the regulation arbitrary and capricious.

To return to the fundamental issue presented by Ms. Newman, the regulation finally adopted by the Commissioner after this court issued the *Newman I* decision is arbitrary and capricious because it declares that "no reliable information exists which is currently available to use in de-

termining benefit amounts" when in fact, and admittedly, such information *is* available.[1] It is undisputed that the changes in Title II benefits for approximately one-half of the affected recipients *are* posted to the SSI records in time to permit payment without the two month delay. *Id.* The Commissioner's explanation for not treating this information as available—namely, that it would be "inequitable" to treat recipients of subsistence benefits differently on the basis of when in the month the information regarding their decrease in income is received—is clearly not founded in reason or logic. The statute is cast in terms of the available information regarding the individual recipient. A refusal to make full benefit payments to those individuals whose information *is* available and who are clearly entitled to receive those payments is not consistent with the basic objectives of the Social Security Act.

The underlying purpose of the Act is "to assure a minimum level of income for people who are age 65 or over, or who are blind or disabled and who do not have sufficient income and resources to maintain a standard of living at the established Federal minimum income level." *See* 20 C.F.R. § 416.110; *Paxton v. Secretary,* 856 F.2d 1352, 1353 (9th Cir.1988). The program thus establishes "a minimum income level below which the federal government thinks people should not have to live." *Paxton,* 856 F.2d at 1353. Withholding benefit payments on the basis of an arbitrary and capricious regulation violates the statutory scheme. It is evident from the language of the "reliable information" exception that Congress was aware that there would be some difference in the times at which the payment of full benefit amounts to individuals would be possible. The "reliable information" provision by its terms applies to the information available with respect to the particular individual involved (e.g., "the income . . . of an indi-

---

1. Title II benefit information is clearly also "reliable" under 20 C.F.R. § 416.420(c)(1) because it is maintained on a computer system within the Social Security Administration. 62 Fed.Reg. 30747, 30749 (June 5, 1997).

vidual" and "the benefit amount of such individual." 42 U.S.C. § 1382(c)(4)(A)).

There is nothing inequitable about providing for the basic needs of those to whom benefit payments can be made, even though there are other individuals whose payments cannot be made until a later date. The Commissioner's policy exacerbates rather than alleviates the inherent unfairness of his delayed accounting procedure, by withholding benefits to which aged, blind, and disabled persons *are* entitled, solely for the reason that the claims of others cannot be processed at the same time.

Contrary to the Commissioner's view, equity does not mean that *all* must suffer a deprivation of their rights simply because it is necessary to delay payments to *some.* Making others suffer unnecessarily does not improve the lot of those who must suffer in any event. If some aged, blind, or disabled persons must, for reasons of the Commissioner's hidebound bookkeeping procedures, go without food or shelter for a period of time, it is *not* more equitable to cause all aged, blind and disabled persons to go without—and suffer equally. That is neither right nor just, and benefits no-one. The concept of equity mandates fairness to all, not the imposition of unnecessary hardship on some. This fact has thus far escaped the Commissioner. I believe it is within our authority, in fact that it is our obligation, to correct his grievous error.[2]

---

**2.** I do not reach the argument implicit in the majority's opinion that because the statute states that the Commissioner "may" calculate benefit payments on the basis of reliable currently available information, he would have the discretion in all events to ignore such information. While I disagree with the majority on this point, in view of the content of the regulation before us, I need not discuss it further. In this case, the Commissioner's reg-

ulation is arbitrary and capricious. Therefore, he may not withhold payments on that basis. Accordingly, Ms. Newman is entitled to relief.